AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Jul 15, 2020

OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Hot Springs Division

| | |
|---|---|
| In the Matter of the Search of ) | |
| Electronic evidence currently in custody of ) | Case No.  6:20cm12 |
| Federal Bureau of Investigation, Fort Smith ) | |
| Resident Agency relating to the investigation of ) | |
| George A. Scurlock, further described in ) | |
| Application A ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **Electronic evidence currently in custody of Federal Bureau of Investigation, Fort Smith Resident Agency relating to the investigation of George A. Scurlock, more particularly described on "Attachment A".**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*: **See "Attachment B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

■  evidence of a crime;

■  contraband, fruits of crime, or other items illegally possessed;

■  property designed for use, intended for use, or used in committing a crime;

☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |
| 18 U.S.C. § 2423(b) | Interstate Transportation of a Minor with Intent to Engage in Illicit Sexual Conduct |

The application is based on these facts: **See Affidavit of TFO Warren Seals**

■  Continued on the attached sheet.

☐  Delayed notice of       days (give exact ending date if more than 30 days:                ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Warren Seals, Task Force Officer, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  **7/15/20**

_____
*Judge's signature*

City and state:  Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Warren A Seals, a Task Force Officer (TFO) for the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

### INTRODUCTION

1.     I am a sworn law enforcement officer in the state of Arkansas.  I have been deputized by the United States Marshals Service to conduct federal criminal investigations of violations of Titles 18 and 21 of the United States Criminal Code.

2.     I am a Criminal Investigator employed by the Crawford County (Arkansas) Sheriff's Department.  I have been employed by the Crawford County Sheriff's Department since April 2011.  I am currently assigned to the River Valley Child Exploitation and Human Trafficking Task Force that operates out of the FBI Resident Agency (RA) in Fort Smith, Arkansas.  As part of my duties as a TFO with the River Valley Child Exploitation Task Force, I investigate criminal violations committed through the use of facilities of interstate and foreign commerce such as cell phones and computers connected to the internet; the sexual exploitation and trafficking of minor children committed through the use of the internet; unlawful online enticement of a minor; and the production, possession, receipt, distribution and transportation of child sexual abuse material in interstate and foreign commerce.  I have received training to investigate crimes against minors; the sexual exploitation and trafficking of minors through the internet; and the production, possession, receipt, distribution and transportation of child sexual abuse material.  I have participated in the execution of numerous search warrants and arrest warrants involving internet crimes against minors, sex trafficking of minors, and child exploitation and/or child sexual abuse material offenses.

3.     Based on the facts set forth in this Affidavit in support of a Search Warrant, your Affiant has probably cause to believe that evidence of child pornography may exist on the two

cellular phones and three laptop computers that were seized by Montgomery County Sheriff's Office (MCSO) detectives while executing a search warrant at the residence belonging to George A. Scurlock on August 9, 2019. Specifically, the SUBJECT DEVICES are:

    a. **A Motorola smartphone mobile phone, Serial Number SJUG7776AA,** seized from the person of George A. Scurlock by MCSO while executing a search warrant.

    b. **A Orbic smartphone mobile phone,** seized from the person of George A. Scurlock by MCSO while executing a search warrant.

    c. **An HP Pavillion laptop computer, Serial Number 00196-191-217-757,** seized from residence of George A. Scurlock, 312 Laurel Street, Mount Ida, Arkansas, by MCSO while executing a search warrant.

    d. **A Dell Inspiron laptop computer, Serial Number HSR4HR1,** seized from residence of George A. Scurlock, 312 Laurel Street, Mount Ida, Arkansas by MCSO while executing a search warrant.

    e. **An HP Pavillion DV 9700 laptop computer, Serial Number CNF8311KDY,** seized from residence of George A. Scurlock, 312 Laurel Street, Mount Ida, Arkansas by MCSO while executing a search warrant.

    4.    The SUBJECT DEVICES are currently located in Fort Smith, Arkansas in a secured evidence facility maintained by the FBI Little Rock Division, Fort Smith Resident Agency and therefore are located in the Western District of Arkansas, Fort Smith Division. The purpose of this application is to forensically examine the above described devices for evidence of violations of Title 18, United States Code, Section 2252A(a)(5)(B), Possession of Child Pornography and Title 18, United States Code, Section 2423(b), Interstate Transportation of a Minor with Intent to Engage in Illicit Sexual Conduct.

5.      This Affidavit is being submitted based on information from my own investigative efforts, as well as information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein. This Affidavit does not include all of the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant.

## DEFINITIONS

6.      "Child Pornography" as defined in Title 18, United States Code, Section 2256(8), is any depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

7.      Title 18, United States Code, Section 2256(1) defines a minor as any person under the age of eighteen years.

8.      Title 18, United States Code, Section 2256(2)(A) defines "sexually explicit conduct" to mean actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same sex or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. In considering whether a visual depiction of the genitals or pubic area constitutes the lascivious exhibition the fact finder can consider any of the following: 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of

the depiction is sexually suggestive, that is, in a place or pose associated with sexual activity; 3) whether the child is depicted in an unnatural pose or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; or 6) whether the depiction is designed to elicit a sexual response in the viewer. No one factor is determinative and the ultimate determination of whether a depiction is "lascivious" must be based on the overall content of the visual depiction. The Eighth Circuit has stated that lasciviousness "may be found when an image of a nude or partially clothed child focuses on the child's genitals or pubic area and is intended to elicit a sexual response in the viewer." *United States v. Kemmerling*, 285 F.3d 644, 646 (8th Cir. 2002).

9.      Title 18, United States Code, Section 2256(5) defines "visual depiction" to include undeveloped film and videotape, data stored on a computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

10.      "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

11.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See Title 18, United States Code, Section 1030(e)(1).

10.    12.      Title 18, United States Code, Section 2423(a) makes it a violation of federal law to knowingly transport "an individual who has not attained the age of 18 years in interstate or

foreign commerce . . . with intent that the individual engage in ... any sexual activity for which any person can be charged with a criminal offense."

11.     Arkansas Code Annotated § 5-14-103(a)(4)(A)(ii), Rape, a class Y felony, makes it a criminal offense to engage in sexual intercourse or deviate sexual activity with a minor and the actor is the minor victim's "uncle, aunt, grandparent, step-grandparent, or grandparent by adoption."

12.     "Deviate sexual activity" is defined in Arkansas Code Annotated § 5-14-101 as "any act of sexual gratification involving the penetration, however slight, of the anus or mouth of a person by the penis of another person; or the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person."

13.     "Sexual intercourse" is defined in Arkansas Code Annotated § 5-14-101 as "penetration, however slight, of the labia majora by a penis."

14.     Title 18, United States Code, Section 2423(b) makes it a violation of federal law to knowingly travel in interstate commerce for the purpose of engaging in any illicit sexual conduct with another person.

15.     Title 18, United States Code, Section 2423(f) provides that... "illicit sexual conduct" means "a sexual act (as defined in section 2246) with a person under 18 years of age."

16.     Title 18, United States Code, Section 2246(2)(D) defines "sexual act" as "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."

## TRAINING AND EXPERIENCE IN THE INVESTIGATION OF CHILD PORNOGRAPHY AND ONLINE SEXUAL EXPLOITATION OF CHILDREN

17.     In my training and experience, persons involved with child pornography, child sexual abuse material or other forms of online sexual exploitation of children generally prefer to store depictions of child sexual abuse material or other similar evidence of their crimes on computers, removable storage devices, email accounts or other hardware or media that can store visual depictions in digital form.  The capacity of external hard drives, flash drives, and other storage media has increased dramatically in recent years and the cost of storage media has gone down.

18.     Based on my training and experience, and the experience of other agents, your Affiant knows that individuals involved in child pornography almost always retain copies of the sexually explicit material they receive.  Among the reasons copies are maintained is because child pornography is illegal to openly purchase, and the most common method of acquiring it is by trading with other people with similar interests.  It is also known that due to the inherent illegality of these sexually explicit materials, they are most often kept in a secure place, usually a residence, to avoid detection by law enforcement.  Your Affiant has also learned from his training and experience, and from talking with other seasoned law enforcement officers, that possession of child pornography is continuing in nature, and oftentimes collectors of child pornography do not quickly dispose of images they have received.  To the contrary, those involved in child pornography and other forms of online sexual exploitation of children commonly retain images and other relevant digital evidence and store it in secure locations for long periods of time.  These locations often include the offenders' home computers, smart phones and other external devices,

email accounts, and remote "cloud" storage services, like those offered by Google, Apple, and other companies.

19.     Furthermore, I am aware that when obtaining a new computer or cellular phone, information from the old devices being replaced, often gets "dumped" onto the newer devices, therefore causing a newer device to sometimes contain information, data, images, and other content, from an older device.  This process of "dumping" content from an older device to a new device can be done remotely and the user does not necessarily need physical access to the old device in order to do so.

## PROBABLE CAUSE

20.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because:

21.     On September 18, 2019, an incident complaint was received by the FBI River Valley Child Exploitation and Human Trafficking Task Force regarding the possible interstate travel for illicit sexual contact with a minor.  The complaint stated that George A. SCURLOCK ("SCURLOCK") traveled from his home in Mount Ida, Arkansas, to a residence in Muskogee, Oklahoma, in order to sexually assault an 8-year-old female ("Jane Doe 1").

22.     The complainant, Jane Doe's mother, stated Jane Doe 1 was staying with Jane Doe 1's great-grandparents, B.H. and F.H., in Muskogee, Oklahoma, during the summer of 2019.  Jane Doe 1's mother said that SCURLOCK traveled from his home located at 312 Laurel Street, Mount Ida, Arkansas to B.H.'s residence located in Muskogee, Oklahoma, and sexually assaulted Jane

Doe 1. Jane Doe 1's mother said that SCURLOCK was the step-grandfather of Jane Doe 1.

23.     Jane Doe 1's mother also stated that SCURLOCK was employed as a truck driver, and that Jane Doe 1 had been sexually assaulted by SCURLOCK while traveling across state lines with SCURLOCK in his truck.

24.     The complaint stated that the incident had been previously reported and investigated by the Montgomery County Sheriff's Department (MCSO) in Arkansas, as well as law enforcement agencies in Oklahoma.

25.     The investigative report provided by the MCSO dated August 2019 stated that on August 3, 2019, Jane Doe 1's mother and K.S., SCURLOCK'S wife and grandmother of Jane Doe 1, filed a report with the MCSO alleging that SCURLOCK had sexually assaulted Jane Doe 1. The report indicated that the sexual assault took place at SCURLOCK's residence located at 312 Laurel Street, Mount Ida, Arkansas; in Muskogee, Oklahoma; and while on the road in SCURLOCK's truck. The ensuing investigation determined that the travel originated in Montgomery County, Arkansas and proceeded to Northwest Arkansas, Texas, and Oklahoma.

26.     A forensic interview of Jane Doe 1 was conducted August 5, 2019 at the Mercy CAC located in Hot Springs, Arkansas. Your Affiant reviewed the interview on October 8, 2019.

27.     During the forensic interview, Jane Doe 1 stated she was 8-years-old. Jane Doe 1 stated she had been "sexually abused" by her "grandpa." Jane Doe 1 identified her grandpa as SCURLOCK. Jane Doe 1 stated that while she was spending the night at her grandparents' residence, her grandpa kissed her and then, "He told me to get on him and he got his thingy out, he got his dick out. He said 'This is a dick' and he made me lick it." Jane Doe 1 disclosed that SCURLOCK used his penis to penetrate Jane Doe 1's mouth, vagina, and anus.

28.     Jane Doe 1 was asked if she had ever been shown videos or photos of people

without clothes. Jane Doe 1 stated SCURLOCK had shown her videos of people "having sex." She said that SCURLOCK told her it was "sex" because he would show her the videos and make her watch "every time he does it with me" and she said SCURLOCK would ask her if she wanted "to have sex." Jane Doe 1 said that SCURLOCK used his phone to show her the pornographic videos.

29.     Jane Doe 1 said that SCURLOCK told her not to tell anyone and now she was concerned that he may "hurt" or "kill" her.

30.     On September 26, 2019, your Affiant interviewed K.S. During the interview, K.S. stated she was the estranged wife of SCURLOCK and they had been married since 2014. K.S. said they were separated and filing for divorce because SCURLOCK sexually assaulted her granddaughter. K.S. said SCURLOCK was employed as a truck driver and he had been driving for C Cross Transport. K.S. said she rode with SCURLOCK in the truck and she "kept the books."

31.     K.S. said that Jane Doe 1 rode with her and SCURLOCK in the truck one week during the spring or summer while Jane Doe 1 was out of school. She believed they traveled with Jane Doe 1 to Louisiana, Oklahoma, and Texas. K.S. said that Jane Doe 1 disclosed to her that SCURLOCK sexually assaulted her while on this trip.

32.     K.S. told investigators that she and SCURLOCK broke their typical routine in June of 2019 in order to visit Jane Doe 1 while she was at B.H.'s residence in Muskogee, Oklahoma. K.S. said they usually would drive on the road during the week and stay home on the weekends. K.S. said that on this occasion, they did not go home for the weekend as the usually do; instead, SCURLOCK drove them to Muskogee, Oklahoma on Saturday and they stayed at B.H.'s residence until the next Monday morning. K.S. said that SCURLOCK requested an assignment in Fort Gibson, Oklahoma in order to be close enough for the visit. K.S. told investigators that, while in

route to Muskogee, Oklahoma, SCURLOCK made several comments about how he missed Jane Doe 1 and he was excited to see her. K.S. told your Affiant that Jane Doe 1 disclosed to her that SCURLOCK sexually assaulted Jane Doe 1 while at K.S.'s parents' residence in Muskogee, Oklahoma.

33.     K.S. provided investigators with her mobile phone and she stated it previously belonged to SCURLOCK. K.S. provided written consent for Investigators to search the mobile phone.

34.     On October 2, 2019, the data located on K.S.'s phone was extracted by Arkansas State Police (ASP) and your Affiant reviewed the extracted information. Among the information reviewed, was a photo of Jane Doe 1 located on the phone. K.S. confirmed this photo was taken at her parents' residence in Muskogee, Oklahoma during the weekend when SCURLOCK allegedly sexually assaulted Jane Doe 1. The metadata for the photo showed the photo had been taken on Sunday, June 16, 2019.

35.     Also included in the information extracted from the phone were several text messages from SCURLOCK's supervisor and employer assigning truck routes and destinations to SCURLOCK.   There was also cell tower information provided with the phone extraction, which could be used to determine locations. The cell tower information from K.S.'s phone were between the dates of 07/12/2018 and 07/30/2018.

36.     On August 15, 2019, a second forensic interview was conducted with Jane Doe 1 at the Mercy CAC. Your Affiant obtained a copy of the recorded interview and reviewed the interview. During the forensic interview, Jane Doe 1 stated, "I have a grandpa, he's not my grandpa anymore because he sexually abused me." Jane Doe 1 disclosed that she was visiting her great-grandparents in Oklahoma for three weeks during the summer. Jane Doe 1 stated that while

she was in Oklahoma, SCURLOCK and K.S. spent a weekend with them.

37.     Jane Doe 1 told the forensic interviewer that she had previously not disclosed because "he told me not to tell" and she thought "he would actually kill me or punch me or anything like that so I didn't tell for a long time." While beginning to talk about the sexual abuse and what occurred at her great-grandparents' residence, Jane Doe 1 said, "I kind of made it up, I didn't really think he would do it..." Jane Doe 1 then disclosed that while in Muskogee, Oklahoma, SCURLOCK went into a bedroom to take a nap and Jane Doe went into the bedroom to retrieve a ball. While inside the bedroom with Jane Doe 1, SCURLOCK kissed her by inserting his tongue inside her mouth and then SCURLOCK laid her down on the bed and told her that he wanted to put his body inside her.

38.     During this interview, Jane Doe 1 said, "I think he took pictures of me naked, or sleeping." She stated she was not sure if this occurred and she attempted to search his phone for the images but she could not because, "every time I would try, he would be there."

39.     On October 23, 2019, your Affiant interviewed B.H., Jane Doe 1's great-grandmother. During the interview, B.H. said she was K.S.'s mother and she was the great-grandmother of Jane Doe 1. B.H. said that in late May or early June of 2019, Jane Doe 1 visited her at her residence for several weeks. B.H. said that SCURLOCK and K.S. did come visit for a weekend while Jane Doe 1 was at her residence. B.H. said that SCURLOCK and K.S. stayed for two nights.

40.     B.H. said that Jane Doe 1 had a bedroom but Jane Doe 1 slept on the couch while SCURLOCK was there. B.H. told your Affiant that during one of the nights that SCURLOCK was visiting, B.H. heard noises during the night. B.H. walked into the living room at approximately 5:30 a.m. and saw Jane Doe 1 asleep on the couch and she was uncovered from the

waist down and her panties appeared to have been pushed to the side.  B.H. said SCURLOCK was sitting in a chair across the room looking at Jane Doe 1.  B.H. said that SCURLOCK said Jane Doe 1 "stunk" and needed a bath.

41.     While at B.H.'s residence, your Affiant photographed the bedroom where Jane Doe 1 usually slept and the living area containing the couch Jane Doe 1 slept on while SCURLOCK was visiting.

42.     On October 10, 2019, a third forensic interview was conducted with Jane Doe 1 at the Mercy CAC located in Mena, Arkansas.  Your Affiant was present and observed the forensic interview.

43.     During this forensic interview, Jane Doe 1 stated she traveled in the truck with SCURLOCK and K.S.  Jane Doe 1 said that on three occasions, while in the truck, SCURLOCK sexually assaulted her.  Jane Doe 1 said that SCURLOCK kissed her and inserted his tongue inside her mouth and he used his hands to touch her vagina, outside her clothes.  Jane Doe 1 said this would occur when K.S. was not in the truck.

44.     Jane Doe 1 recalled an incident in which K.S. left the truck one morning to get sausage biscuits.  While K.S. was gone, SCURLOCK laid Jane Doe 1 on the bed in the back of the truck cab and kissed her and touched her vagina.  Jane Doe 1 said that SCURLOCK pushed down on her vagina and it "hurt really bad."

### September 2019 Interview of SCURLOCK

45.     On September 26, 2019, MCSO investigators interviewed SCURLOCK in relation to their investigation of the allegations made by Jane Doe 1.  Your Affiant received an audio recording of this interview and has reviewed the recording.  SCURLOCK was read his *Miranda* rights, and waived his rights, agreeing to speak with investigators.

46.     During the interview, SCURLOCK told investigators he was now living with his parents at 112 Scurlock Drive, Mount Ida, Arkansas. SCURLOCK told investigators he moved there just after the allegations came out. SCURLOCK said he drove a truck for "Coke" in Hot Springs, Arkansas, and before this, he drove a truck for C Cross Transport. SCURLOCK told investigators that while working for C Cross Transport, he would travel out of state for about two weeks and then come home and stay for about 34 hours.

47.     SCURLCOK acknowledged he had previously been accused of sexual assault by his ex-step-daughter, Jane Doe 2, in 2008. He stated the "first round" was orchestrated by his ex-wife, T.C., because she was angry when he filed for divorce. A divorce decree was located in which SCURLOCK filed for divorce from T.C. on March 3, 2008; thirteen days after T.C. filed for an Order of Protection and reported the allegations of rape.

48.     SCURLOCK denied he committed any sexual assault on any of his stepchildren or step-grandchildren. SCURLOCK stated he could not rape anyone because he was impotent. He said he had no sexual desire due to his impotency. He stated he did not have "the want" to have sexual encounters with anyone. However, later in the interview, SCURLOCK said he used his mobile phone and his computer to view pornography about four or five times a month. He also stated he masturbated while viewing the pornography.

49.     SCURLOCK told MCSO investigators that Jane Doe 1 road with him and K.S. in the truck to Texas and Louisiana on a four day trip "about a year ago." SCURLOCK further told investigators that he requested a route that took him close to Muskogee, Oklahoma in June of 2019 so that he could take K.S. to her parents' residence. SCURLOCK said he was in Muskogee for four and a half hours "at the most." SCURLOCK said that while at the residence, he did lay down in the bedroom for approximately three hours. He said that during this time, Jane Doe 1 did come

into the bedroom and woke him up and he said he had to yell for K.S. to remove Jane Doe 1 from the bedroom.

### Arrest and Interview of SCURLOCK

50.      On March 11, 2020, SCURLOCK was arrested in Hot Springs, Arkansas pursuant to a federal arrest warrant and indictment issued by the United Stated District Court, Western District of Arkansas for the charge of Interstate Transportation of a Minor to Engage in Illegal Sexual Activity, Title 18, United States Code, Section 2423(a), for Jane Doe 2 from interstate travel in 2008.

51.      Following the arrest, SCURLOCK was interviewed by your Affiant.  Scurlock was read his *Miranda* rights and SCURLOCK stated he understood them and he agreed to speak with investigators.

52.      During this interview, SCURLOCK made several inconsistencies from his previous statements.  SCURLOCK acknowledged being accused of sexual assault by Jane Doe 1.  When asked if anyone else has accused him of sexual assault, SCURLOCK answered, "Nope." SCURLOCK was confronted with the fact that Jane Doe 2 made allegations as well and SCURLOCK stated that is was Jane Doe 2's mother, T.C. that made the allegations.  SCURLOCK said that Jane Doe 2 refused to make any allegations.   Scurlock also denied ever traveling with Jane Doe 1 and/or Jane Doe 2 in his truck.

53.      Your Affiant has also learned that on August 9, 2019, law enforcement with the Montgomery County Sheriff's Department sought and obtained a state search warrant for the residence of George Scurlock at 312 Laurel Street, Mount Ida, Arkansas.  On August 9, 2019 the Montgomery County Sheriff's Office executed the search warrant. During the execution of the search warrant, George Scurlock was encountered by MCSO investigators when he came to open

the property for the execution of the warrant. At that time MSCO investigators seized the two cellular phones described in Attachment A from the person of George Scurlock. MCSO also seized multiple items, including electronics, specifically those detailed in Attachment A from the residence of George Scurlock. On August 23, 2019, MCSO investigators sought and obtained two state search warrants for the search of the electronics seized pursuant to the August 9, 2019 search warrant, as described in Attachment A.

54.     On July 7, 2020, your Affiant met with MCSO detectives regarding the electronic evidence seized by the MCSO on August 9, 2019.  MCSO detectives allowed your Affiant to review the information seized from the electronics, which included the three laptop computers and two mobile phones described in Attachment A.  MCSO detectives advised that the Arkansas State Crime Laboratory (ASCL) had initially reviewed the devices, but that it did not have the capacity to fully extract and search the electronic devices for items of evidentiary value so the information provided by the ASCL was limited.  MCSO detectives stated only photos were searched for on the laptops and one of the phones could not be forensically searched so they only took photos of the images readily available in the phone's image folder.  MCSO detectives signed custody of the evidence over to FBI investigators and the evidence was then transported to the FBI Residence Agency located in Fort Smith, Arkansas for safekeeping.

55.     Upon your Affiant's review of the electronic data of the phones and the laptops provided by MCSO, several images of pornography and what appears to be child sexual abuse material were located.  On the laptop hard drive labeled "D-4" that was taken from the HP laptop, Serial Number CNF8311KDY, the reviewed images of child sexual abuse material were the following:

    a.  Image name, "AKiGtDtyX[1].jpg," depicting a white female, estimated age of

approximately 15 or 16 years old, laying on her side on a bed and being vaginally penetrated from behind by an adult white male's penis. The adult white male's face is outside the shot of the image. The female is unclothed from the waist down and she is wearing a pink top that has been pulled up to expose her breast.

b.   Image name, "EpuAoxiRbv[1].jpg," depicting a white female, estimated age of approximately 13 years old, laying on her back on a bed inside what appears to be a hotel room. The female is unclothed from her waist down, exposing her vagina. The female is wearing a blue top that has been pulled up to expose her breast.

c.   Image name, "3e988d[1].jpg," depicting a young white male, estimated age of approximately 16 years old, standing in a shower with an adult female. The image shows the people from the waist up and both are unclothed from the waist up. It is implied the two are completely unclothed. The male is holding one of the adult woman's breasts.

d.   Image name, "mmATwfKUdx[1].jpg," depicting a white female, estimated age of approximately 15 or 16 years old, positioned on her knees masturbating a white male's penis. Only the male's penis and leg are in the shot and age of the male cannot be determined.

e.   Image name, "SlLyoWXTQm[1].jpg," depicting a young female, estimated age of approximately 12 or 15 years old, laying on her stomach on a bed. The female is unclothed from her waist down and wearing a red top that has been pulled up to expose her breast. The female is being vaginally penetrated from behind by an adult white male. The adult male's face is outside the frame of the image.

56.   Among the electronic data retrieved from the Orbic mobile phone seized from

SCURLOCK's person, were two photos taken of Jane Doe 1 sleeping on a couch. The first image depicts Jane Doe 1 sleeping in a fetal position with a blanket pulled next to her. In the next image, the blanket has been pulled away from her and is entirely out of the shot and Jane Doe 1 has been rolled over and appears to have been positioned on her back. The image depicts Jane Doe 1's entire body and face but appears to focus on the lower have of her body. The image is so that the person who took the photo would have been standing directly over Jane Doe 1 while she was sleeping on the couch. Jane Doe 1 is clothed in both images. No metadata is available for these photos due to the limited search conducted.

57.     Your Affiant compared the couch in these photos to the photographs taken of B.H.'s residence. The couch and a lamp placed near the end of the couch were the same as the items in B.H.'s residence, confirming these images were taken at B.H.'s residence while SCURLOCK was visiting, thus these images corroborate the statements of both Jane Doe 1 and B.H.

58.     Also among the images located on SCURLOCK's device were several images of pornography depicting a rape fantasy including images from websites, "ripherup.com" and "rapesection.com," which appear to be websites designed for the purposes of rape fantasies. A logo with the words "abusedwitness" was located on several pornographic images depicting what appeared to be of the rape fantasy genre. When researching this website, your Affiant was led to a website called "HeavyR.com" which stated on the home page "Heavy-R is here to please your mind and balls with the most disgusting and mind-boggling fetish porn you want and need!" The home page showed categories, which included categories titled, "Torture", "Humiliation", "Young", and "Old Vs Young." Among the pornographic images located on SCURLOCK's devices were also several images depicting women sleeping and having sexual acts performed upon them while they were sleeping.

59.     On May 26, 2020, a telephonic interview was conducted with K.S.  During the interview, K.S. confirmed that when SCURLOCK received or purchased a new mobile phone, he would back up and transfer the data from his old phone onto the new phone and he would also keep the SIM cards in order to keep and transfer older data.

## CHARACTERISTICS COMMON TO CHILD PORNOGRAPHERS

60.     Based on my training, knowledge and experience, I am aware that individuals who commit child sexual exploitation offenses involving minors will often collect and/or view child pornography on their computer, and digital media storage devices, for several reasons:

    a.     They will receive sexual gratification and satisfaction, and/or fantasize about sexual contact with minors by viewing minors engaged in sexual activity or sexually suggestive poses;

    b.     They collect sexually explicit or sexually suggestive materials of minors in a variety of media that they use for their own sexual arousal and/or gratification;

    c.     They almost always possess and maintain their material in the privacy and security of their homes or some secure location.  Child pornography distributors/collectors typically retain recordings, mailing lists, child erotica and store their child pornography amongst other, otherwise legal media or files.  Digital evidence, like child pornography contraband, is different than traditional evidence that can be concealed, sold, used and/or destroyed and is not as volatile as other illegal items like narcotics; and

    d.     Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, to enable the collector to view the collection, which is valued highly.

61.     Child pornography collectors also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors and conceal such correspondence as they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

62.     Collectors of child pornography prefer not to be without their child pornography for any prolonged period of time.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

63.     Increasingly, individuals who produce, distribute, transport, receive, or possess child pornography, or who attempt to commit these crimes, use mobile computing devices to do so.  These portable devices can connect to the Internet at an individual's residence, or also through routers and wireless routers in various public and private locations.  Mobile computing devices and electronic storage media such as laptops, tablets, smart phones, and flash drives, often travel with the person utilizing them and are commonly found in residences during search warrants.

64.     I know computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.  Photographs and other digital images must be stored as data on a computer or other digital media device using specialized software to transfer images from a digital camera to a computer, or electronic storage device, or by transferring images saved onto a media card to a computer or electronic storage device.  I know that if a child pornography viewer chooses to upgrade their electronic storage device, it is a simple process to transfer images from one device to another device.  After the photograph or other image has been transferred onto the computer, the computer stores the data from the image as an individual "file." Such a file is generally known as a "GIF" (Graphic Interchange Format) or "JPEG" (for the Joint

Photographic Experts Group, which wrote the standard) file, recognizable by the ".gif" or ".jpg" file extensions (hereafter referred to as an "image file"). Computers are capable of rendering the digital image on a computer screen, transferring the image to another computer, and/or printing the image.

65.     I know that computer hardware, other digital devices, software, and electronic files are important to a criminal investigation in two distinct ways:  the objects themselves may be contraband, evidence, instrumentalities, or fruits of a crime; and/or the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data.

66.     The computer's capability to store images in digital form makes it an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as a "hard drive") used in home computers has grown tremendously with the last several years. Hard drives with the capacity of 160 gigabytes are not uncommon.   These drives can store thousands of images at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime."  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

67.     Computers, mobile phones, and electronic devices have made it possible for collectors of child sexual abuse material to transfer files from one device to another with relative ease.  There are many avenues a collector of child sexual abuse material to take in order to transfer these files such as email, Bluetooth, dropbox, or placing the files on an external device such as a

disk, USB device, or an external hard drive.  This can be done with little technical knowledge and with little or no cost.

68.     In this case, the search warrant application requests permission to search and seize digital media files of child pornography, child erotica and material that represents the sexual exploitation of minors.  The images involving sexual conduct of minors constitute both evidence of crime and contraband.

69.     I know from training and experience that computer systems commonly consist of computer processing units (CPU's), hard disks, hard disk drives, floppy disk drives, tape drives, display screens, keyboards, printers, modems (used to communicate with other computers), electronic cables, cassette tapes, floppy disks, USB flash drives and other forms of magnetic and optical media containing computer information.  In addition, the specific transmission of computerized imagery indicates the possible use of CD-ROM / DVD drives, compact laser disks, image scanning devices, still cameras, lighting equipment, video camera or camcorders, VCRs, digital-analogue translation devices, and the software (computer programming) necessary to operate them.

70.     I know from training and experience that computers and magnetic and optical media are used to store information.  In addition to the above-mentioned image files, that information often includes data files of other persons engaged in similar activities with minors, and lists of other exploited minors, as well as records of correspondence and conversations (printed or electronic) with such persons.

71.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a variety of forensic tools.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications,

so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional destruction (both from external sources and from destructive code embedded in the system such as a "booby trap"), a controlled environment, in most instances, is essential to a complete analysis.

## CONCLUSION

72.    Based on the information contained in this Affidavit, your Affiant respectfully requests a Search Warrant be authorized for the forensic examination of the two mobile phones and three laptops belonging to GEORGE A. SCURLOCK.

Warren Seals
Task Force Officer, FBI

Sworn and subscribed before me this __15__ day of __July__ , 2020.

Honorable Mark E. Ford
United States Magistrate Judge

## ATTACHMENT A

## PARTICULAR ITEMS TO BE SEARCHED

There is probable cause to believe the following items contain evidence fruits, and instrumentalities of violations, including records, documents, programs, applications, hardware, equipment, and materials, of violations of Title 18, United States Code, Section 2252A(a)(5)(B) and Title 18, United States Code, Section 2423(b), Interstate Transportation of a Minor with Intent to Engage in Illicit Sexual Conduct and are more specifically described as follows:

1. **A Motorola smartphone mobile phone, Serial Number SJUG7776AA,** seized from the person of George A. Scurlock by MCSO while executing a search warrant.

2. **An Orbic smartphone mobile phone,** seized from the person of George A. Scurlock by MCSO while executing a search warrant.

3. **An HP Pavillion laptop computer, Serial Number 00196-191-217-757,** seized from residence of George A. Scurlock, 312 Laurel Street, Mount Ida, Arkansas, by MCSO while executing a search warrant.

4. **A Dell Inspiron laptop computer, Serial Number HSR4HR1,** seized from residence of George A. Scurlock, 312 Laurel Street, Mount Ida, Arkansas, by MCSO while executing a search warrant.

5. **An HP Pavillion DV 9700 laptop computer, Serial Number CNF8311KDY,** seized from residence of George A. Scurlock, 312 Laurel Street, Mount Ida, Arkansas, by MCSO while executing a search warrant

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

**ITEMS TO BE SEARCHED FOR AND SEIZED**

a. Any and all images of suspected child pornography and files containing images of suspected child pornography, any and all images believed to be an attempt to produce child pornography, in any form wherever it may be stored or found including, but not limited to:

   i. originals, thumbnails, and copies of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   ii. videos (AKA motion pictures, films, film negatives), and other recordings or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

   iii. Images self-produced of the defendant and minors, and attempts to take or produce such;

   iv. Images of children, nude or otherwise, possessed, sent, received, or via message, email, or otherwise stored on the phone

   v. Internet history, including CACHE memory related to internet searches for child pornography or websites that could pertain such.

b. information or correspondence pertaining to the solicitation of others for sexual activity involving minors, and any and all information, messages, etc related to the sexual exploitation of children, including but not limited to:

   i. correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, text messages, establishing possession, identity of individuals, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

   ii. records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

      iii.    Any and all address lists, names, contact information of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; and/or any information evidencing contact or correspondence with minors or adults in whatever form.

      iv.    Any and all chat log, text messages, email, or any type of communication in any form that is related to the sexual exploitation of minors for sexual purposes or related to the production, distribution or possession of child pornography.

c.    records evidencing ownership of the subject item, including in and all lists of names, telephone numbers, addresses and contacts, and the content of voice mails and text messages and internet based applications, and internet or purchase history for any and all sexual devices, including but not limited to dildos, vibrators and sexual games.

d.    Any and all security devices, to include encryption devices, needed to gain access to the devices;

e.    Any and all address lists, names, contact information of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; and/or any information evidencing contact or correspondence with minors or adults in whatever form.

f.    Any and all recordings, including those made by the defendant or the minor victim, or anyone else that depicts the defendant or others engaging in sexually explicit conduct of any type.

g.    Any and all images and/or videos corroborating the statements of Jane Doe 1, including any and all images and/or videos corroborating the interstate travel of Jane Doe 1 with George A. Scurlock.

h.    In searching the data, the computer personnel may examine and copy all of the data contained in the subject item to view their precise contents and determine whether the data falls within the items to be seized. In addition, the examining personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized.